******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## CINDY L. KAREN *v.* WILLIAM P. LOFTUS
### (AC 46184)

Clark, Seeley and Prescott, Js.

*Syllabus*

The plaintiff appealed following the trial court's denial of her motion to open the dissolution judgment to allow discovery on her claim that the defendant had fraudulently procured an arbitration award that was incorporated into that judgment pursuant to statute (§ 46b-66). The plaintiff claimed that the trial court incorrectly determined that she had failed to establish probable cause to substantiate her fraud allegations. *Held*:

The trial court had subject matter jurisdiction to adjudicate the plaintiff's motion to open, even though it was filed outside the applicable statutory (§ 52-420 (b)) time frame.

The trial court improperly denied the plaintiff's motion to open the judgment based on fraud, as the plaintiff presented evidence of the defendant's making of false statements or his failure to disclose facts, which was sufficient to establish probable cause to substantiate her claim of fraud, thereby warranting discovery and further proceedings.

Argued January 29—officially released September 17, 2024

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Hon. Gerard I. Adelman*, judge trial referee, approved the stipulation of the parties to enter into binding arbitration as to certain disputed matters; thereafter, the arbitrator issued a decision, and the court, *Sommer, J.*, incorporated the arbitrator's decision into its judgment dissolving the marriage and granted certain other relief in accordance with the parties' separation agreement; subsequently, the court, *Hon. Eddie Rodriguez, Jr.*, judge trial referee, denied the plaintiff's motion to open the judgment, and the plaintiff appealed to this court, *Elgo, Suarez* and *Palmer, Js.*, which reversed the trial court's judgment and remanded the case for further proceedings; thereafter, the court, *Truglia, J.*, denied the plaintiff's motion

to open the judgment, and the plaintiff appealed to this court. *Reversed*; *further proceedings*.

*Thomas J. Rechen*, with whom were *Charles D. Ray* and, on the brief, *Gregory A. Hall*, for the appellant (plaintiff).

*Anthony L. Cenatiempo*, with whom, on the brief, was *Norman A. Roberts*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. This marital dissolution matter, which requires the resolution of jurisdictional and merits related issues arising from the arbitration of a specific aspect of the parties' prenuptial agreement, returns to us for a second time. Following the dissolution of the parties' marriage, the plaintiff, Cindy L. Karen, has endeavored to open that judgment for the limited purpose of allowing discovery with respect to her claim that the arbitration award, which subsequently was incorporated into the dissolution judgment, was procured by fraud committed by the defendant, William P. Loftus.[1] In this appeal, the plaintiff claims that the court improperly denied her motion to open the dissolution judgment for the limited purpose of conducting discovery after it concluded that she had failed to establish probable cause that the arbitration award pertaining to the financial ramifications of the defendant's departure from his employment with Merrill Lynch, and its subsequent incorporation into the dissolution judgment, was obtained by fraud.[2] The defendant disagrees with the merits of the plaintiff's claim and, additionally, contends

---

[1] The defendant recently commenced a separate action against the plaintiff alleging vexatious litigation on the basis of the plaintiff's prosecution of the motion to open that is the subject of this appeal. See *Loftus* v. *Karen*, Superior Court, judicial district of Fairfield, Docket No. CV-23-6127590-S. A motion to dismiss filed by the plaintiff was granted by the trial court on February 26, 2024.

[2] See *Oneglia* v. *Oneglia*, 14 Conn. App. 267, 540 A.2d 713 (1988).

that the trial court lacked subject matter jurisdiction to consider the plaintiff's motion to open because her challenge to the arbitration award was not timely pursuant to General Statutes § 52-420 (b). We are not persuaded by the defendant's jurisdictional claim and agree with the plaintiff that the court improperly concluded that she had failed to establish probable cause as to her fraud claim.[3] Accordingly, we reverse the judgment denying the plaintiff's motion to open and remand the matter for further proceedings.

In our prior decision, we set forth the following relevant facts and procedural history. "The plaintiff and the defendant were married in June, 2007. Prior to the marriage, on May 14, 2007, the parties entered into a prenuptial agreement . . . . Paragraph 6 (B) of the [prenuptial] agreement provides: If, at the time that an action for dissolution of marriage, annulment or legal separation is commenced, [the defendant] has left his employment with Merrill Lynch under an arrangement that is in any fashion tantamount to a sale of his interest in Merrill Lynch, i.e. a transaction under which [the defendant] receives any property, real or personal, including but not limited to a sum of money, by way of a sign-on bonus or otherwise, a premium bonus, and/ or restricted stock or other ownership interest (Sale Proceeds), to work for another entity for any reason

---

[3] The defendant also argues that we should not review the plaintiff's claim on the basis of inadequate briefing. Specifically, he contends that "[o]ther than one reference . . . which did not include the elements of a fraud claim, the plaintiff's brief is devoid [of] any analysis of the fraud elements based upon the evidence submitted in the hearing on the motion to open." In her reply brief, the plaintiff counters that her principal appellate brief adequately addressed the "central issue of this appeal, which is whether [the plaintiff] established probable cause that [the defendant] lied to the arbitrator, resulting in an award that was based on his fraud." (Emphasis omitted.) We agree with the plaintiff. See, e.g., *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444, 35 A.3d 188 (2012); *Lafferty* v. *Jones*, 225 Conn. App. 552, 579 n.33, 316 A.3d 742 (2024); *State* v. *Estrella J.C.*, 169 Conn. App. 56, 81 n.9, 148 A.3d 594 (2016).

whatsoever, including his bringing a book of business and/or a clientele and/or a book of other assets to a prospective employer, then [the defendant] shall first be entitled to set aside the value of $75,000, or $75,000 from the Sale Proceeds, and the balance of such Sale Proceeds, whenever received or receivable by [the defendant], shall be divided between [the defendant] and [the plaintiff] according to the Allocation. . . . If the Sale Proceeds have been invested in other assets, the Parties shall maintain a record of all such investments, and each Party shall be entitled to the value of such Sale Proceeds so invested and any proportional gain or loss that is associated with such investment according to the Allocation. . . .

"In December, 2014, the plaintiff commenced a dissolution action against the defendant . . . . The parties disagreed as to whether the defendant's obligation to pay the plaintiff pursuant to paragraph 6 (B) was triggered by the specific circumstances surrounding the defendant's departure from his employment at Merrill Lynch. Under this paragraph of the [prenuptial] agreement, if the defendant's departure from Merrill Lynch was determined to be tantamount to a sale of his interest in Merrill Lynch, the plaintiff would be entitled to one half of the sale proceeds after the defendant set aside $75,000. If the defendant's departure from Merrill Lynch was not tantamount to a sale, however, the plaintiff would not receive any of the proceeds. On August 1, 2016, the parties entered into [an agreement that clarified the specific schedule and amounts of monthly payments of the defendant's alimony obligation[4] and

---

[4] Specifically, the parties agreed to the following: "The total amount of the alimony due the plaintiff from the defendant is $1,500,000 ($8333 per month times 15 years (180 months). The defendant paid the plaintiff alimony beginning December, 2014, through and including July, 2016, in the amount of $189,416. The defendant therefore owes the plaintiff $1,310,584 ($1,500,000 minus $189,416). Beginning on or before August 15, 2016, and on or before the 15th of each month thereafter, the defendant shall pay the plaintiff $8333 per month through and including July, 2029 (156 months). The defendant's

requested that the court refer] the case to an arbitrator for resolution of the issue of whether the defendant's departure from Merrill Lynch was a sale of his interest in Merrill Lynch. On that same day, the court, *Hon. Gerard I. Adelman,* judge trial referee, accepted the parties' [agreement comprised of the statement regarding the timing of alimony payments and their agreement to arbitrate] and referred the issue of the defendant's departure from Merrill Lynch to an arbitrator.

"The parties agreed to have C. Ian McLachlan, a retired justice of the Connecticut Supreme Court, act as the arbitrator of their dispute.[5] Beginning on February 16, 2017, McLachlan held a two day hearing wherein both parties testified. On April 27, 2017, McLachlan issued a decision in which he concluded that the defendant's departure from Merrill Lynch was not tantamount to a sale under the [prenuptial] agreement. In his memorandum of decision, McLachlan found that, in October, 2008, sixteen months after the parties were married, the defendant and three colleagues left Merrill Lynch and formed a business known as LLBH. Each partner invested between $10,000 and $15,000 to start LLBH.

final monthly alimony payment in the amount of $2333 shall be paid to the plaintiff on or before August 15, 2029."

[5] The August 1, 2016 agreement to arbitrate provided in relevant part: "The parties join in asking this court to refer this case to the Honorable Ian McLachlan (Ret.) to arbitrate and determine the applicability of article 6 of the prenuptial agreement to certain facts presented to Justice McLachlan by each of the parties. The defendant shall be solely [responsible] for Justice McLachlan's fees. . . . Any orders entered pursuant to this paragraph . . . shall be binding upon the parties and incorporated into the judgment of the court. Each party acknowledges that (a) he or she is entering the agreement to arbitrate voluntarily and without coercion; (b) the agreement to arbitrate is fair and equitable under the circumstances; and (c) the agreement to arbitrate does not include issues related to child support, visitation and custody.

"Upon the court's acceptance of the arbitration award . . . the court's orders regarding article 6 of the prenuptial agreement shall supersede the prenuptial agreement and render it null and void after judgment for dissolution of the marriage is entered except as specifically set forth herein."

Shortly after the business was formed, Focus Financial (Focus) purchased an option to buy an interest in LLBH for $2 million, which was shared equally among the partners. Focus subsequently exercised its option, there was a corporate reorganization, and Partner Wealth Management, LLC, was created. When Focus exercised its option, the defendant received $1,665,000 and 90,000 shares of Focus stock, as well as some options.

"McLachlan further found that, at the time of the [prenuptial] agreement, the defendant had certain benefits incident to his employment with Merrill Lynch, including restricted stock units, which he forfeited by leaving Merrill Lynch. This practice of forfeiture was very common in the financial services industry and was one of the reasons that brokers were generally paid a sign-on bonus when changing jobs by the new employer. Additionally, brokers were being paid [by their new employers] for their book of business which, in effect, represented their customers. The plaintiff and the defendant negotiated the [prenuptial] agreement, specifically paragraph 6 (B), to account for this possibility.

"Additionally, McLachlan concluded that the evidence did not support the plaintiff's claim that the defendant contemplated leaving Merrill Lynch at the time the [prenuptial] agreement was made. The defendant did not leave Merrill Lynch until sixteen months after the date of the marriage, and there was no mention of the defendant starting his own business in the [prenuptial] agreement. Ultimately, McLachlan determined that paragraph 6 (B) was drafted in contemplation of the defendant leaving Merrill Lynch and going to a competitor that would compensate him for both the employment benefits that he was forfeiting from Merrill Lynch and the contracts and business that he would bring to the new company. Instead, the defendant left Merrill Lynch to start his own company and invested his own money into the venture. An option to invest in that new

venture was sold, and more than one year later, the business created by the venture itself was sold. According to McLachlan, this scenario is substantially different than the situation where an employee leaves a brokerage house and is compensated by the new employer." (Footnotes added; internal quotation marks omitted.) *Karen* v. *Loftus*, 210 Conn. App. 289, 291–94, 270 A.3d 126 (2022).

On May 12, 2017, the plaintiff filed a motion to confirm the arbitration award, which the court subsequently granted. On June 16, 2017, the trial court, *Sommer, J.*, incorporated (1) the terms of the prenuptial agreement with respect to the division of real estate, personal property, debts and liabilities, (2) the August 1, 2016 agreement, which the court found to be fair and equitable, regarding the timing of the defendant's alimony payments to the plaintiff, and (3) McLachlan's arbitration award into a final judgment of dissolution. Id., 294.

On April 3, 2018, the plaintiff filed a motion to open the dissolution judgment on the ground that the defendant had made fraudulent representations and failed to disclose material facts to McLachlan during the arbitration. Specifically, she claimed that the defendant's contentions that LLBH was a new business, and that business was not sold to Focus when he and his partners left Merrill Lynch, were "wholly contradicted by evidence presented in a subsequent trial concerning the same business . . . ." The plaintiff further alleged that the defendant's representations to McLachlan that (1) when leaving Merrill Lynch, he did not contemplate taking his contacts and clients with him to LLBH, (2) the defendant and his partners did not contemplate an agreement with Focus until after the May 14, 2007 execution of the prenuptial agreement, and (3) the agreement and transaction with Focus did not constitute a sale, were materially false. "The essence of the plaintiff's argument in her motion to open is that the defendant testified

falsely during the arbitration and that McLachlan relied on the purportedly false testimony in concluding that paragraph 6 (B) [of the prenuptial agreement] did not apply to the defendant's departure from Merrill Lynch to form LLBH." *Karen* v. *Loftus*, supra, 210 Conn. App. 294–95.

After additional filings by the parties, the court, *Hon. Eddie Rodriguez, Jr.*, judge trial referee, held a hearing on May 6, 2019, to consider the plaintiff's motion to open the dissolution judgment. Id., 296. The purpose of this hearing was to determine whether a sufficient basis existed to open the judgment for the limited purpose of proceeding with discovery on the allegations of fraud set forth by the plaintiff. See *Spilke* v. *Spilke*, 116 Conn. App. 590, 593–94 and n.6, 976 A.2d 69, cert. denied, 294 Conn. 918, 984 A.2d 68 (2009); *Oneglia* v. *Oneglia*, 14 Conn. App. 267, 269–70, 540 A.2d 713 (1988).

On September 25, 2019, the court denied the plaintiff's motion to open, stating in relevant part: "[T]he plaintiff is mistakenly claiming a second bite at the apple. She is attempting to open a judgment by filing a motion which is well beyond [the] permissible four [month] window to open civil judgments and she is claiming fraud. The exception to opening judgments outside of the initial four months does not apply to cases where a party wants to [relitigate] issues already litigated and decided. She seeks to reopen the judgment and obtain a new trial based on what she attempts to characterize as newly discovered evidence. However the evidence she references as newly discovered is evidence which was available during the arbitration and it would have been cumulative of the evidence offered at the arbitration. The plaintiff's claim fails because the evidence relied upon was not in fact newly discovered evidence and the plaintiff has failed to demonstrate that the evidence could not have been discovered and produced at the former trial by the exercise of due diligence.

Also, it does not appear to this court that a different result would be had at another trial." (Internal quotation marks omitted.) *Karen* v. *Loftus*, supra, 210 Conn. App. 296.

The plaintiff then appealed to this court from the denial of her motion to open, claiming that the trial court had utilized an incorrect legal standard when it rejected her claim. Id., 296–97. We agreed and identified the proper standard as follows: "[T]he court was required to make a preliminary determination of whether there was probable cause to believe that the judgment was obtained by fraud before it could consider the merits of the claim. If the court found probable cause to believe that the judgment was obtained by fraud, then the court was required to conduct an evidentiary hearing to determine whether, in fact, there was fraud." Id., 302. As a result of the trial court's failure to make this preliminary determination, we reversed the judgment and remanded the case for further proceedings. Id., 303.

Pursuant to our remand, the court, *Truglia, J.*, held a hearing on September 9, 2022, and January 4 and 5, 2023, for the purpose of determining whether probable cause existed to open the judgment for the limited purpose of proceeding with discovery as to the plaintiff's claim of fraud. After hearing testimony and considering the submitted exhibits, the court orally denied the plaintiff's motion, stating that it did not "see any fraud . . . any fraud whatsoever [and that] [t]here's no proof, *there's no compelling evidence that* [*the defendant*] *misled . . . McLachlan.*" (Emphasis added.) On February 1, 2023, the court issued a "statement of decision" that contained a brief synopsis of the case and concluded that it had "found no evidence of fraud." This appeal followed.[6] Additional facts will be set forth as necessary.

_____

[6] On May 23, 2023, the plaintiff moved for an articulation of the denial of her motion to open. The trial court denied this motion on June 6, 2023.

On appeal, the plaintiff claims that the trial court improperly concluded that she had failed to establish probable cause that the arbitration award, which subsequently was incorporated into the judgment of dissolution, was obtained by fraud. Specifically, the plaintiff argues that she presented ample evidence of the defendant's misrepresentations and failure to disclose material facts and evidence to McLachlan that resulted in the defendant's fraudulently obtaining an arbitration award in his favor. The defendant counters that the trial court lacked jurisdiction to consider the plaintiff's motion to open and, in the alternative, properly denied the plaintiff's motion to open. We disagree with the defendant's arguments and conclude that the court improperly determined that the plaintiff had failed to meet her preliminary burden of demonstrating that probable cause existed to warrant discovery and an evidentiary hearing as to her allegation of fraud.

I

Before considering the merits of this appeal, we must first address the defendant's claim that the trial court lacked subject matter jurisdiction over the plaintiff's motion to open the judgment. Specifically, he argues that the plaintiff's April 3, 2018 motion to open constitutes an untimely attempt to vacate the April 27, 2017 arbitration award and that, consequently, the trial court did not have jurisdiction to consider it pursuant to § 52-420 (b). In her reply brief, the plaintiff responds that, under the facts and circumstances of this case, where the court incorporated the arbitration award into the terms of a judgment of dissolution, General Statutes § 46b-66 (e) provides the basis for the trial court to consider her motion and claim of fraud related to the arbitration. We conclude that the court had subject

Thereafter, the plaintiff filed a motion for review with this court. On July 19, 2023, we granted review but denied the relief requested.

matter jurisdiction to adjudicate the plaintiff's motion to open.

We begin our analysis of this issue by setting forth the relevant legal principles regarding the opening of a dissolution judgment based on fraud. It is a well established principle that a court has the inherent authority to open a judgment, subject to certain limitations. See, e.g., *Jonas* v. *Playhouse Square Condominium Assn., Inc.*, 173 Conn. App. 36, 39, 161 A.3d 1288 (2017). "Within four months of the date of the original judgment, Practice Book [§ 17-4] vests discretion in the trial court to determine whether there is a good and compelling reason for its modification or vacation." (Internal quotation marks omitted.) *McGovern* v. *McGovern*, 217 Conn. App. 636, 645–46, 289 A.3d 1255, cert. denied, 346 Conn. 1018, 295 A.3d 111 (2023); see also General Statutes § 52-212a;[7] *Hebrand* v. *Hebrand*, 216 Conn. App. 210, 220–21, 284 A.3d 702 (2022).

This rule serves to further the compelling interest in the finality of judgments. *Strauss* v. *Strauss*, 220 Conn. App. 193, 203–204, 297 A.3d 581, cert. denied, 348 Conn. 914, 303 A.3d 602 (2023). "Finality of litigation is essential so that parties may rely on judgments in ordering their private affairs and so that the moral force of court judgments will not be undermined. The law favors finality of judgments . . . . This court has emphasized that due consideration of the finality of judgments is important and that judgments should only be set aside or opened for a strong and compelling reason. . . . It

---

[7] General Statutes § 52-212a (a) provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which the notice of judgment or decree was sent . . . ." Practice Book § 17-4 (a) essentially mirrors the language of § 52-212a (a). See *Fitzsimons* v. *Fitzsimons*, 116 Conn. App. 449, 454–55, 975 A.2d 729 (2009).

is in the interest of the public as well as that of the parties [that] there must be fixed a time after the expiration of which the controversy is to be regarded as settled and the parties freed of obligation to act further in the matter by virtue of having been summoned into or having appeared in the case. . . . Without such a rule, no judgment could be relied on." (Internal quotation marks omitted.) Id., 204; see also *Bruno* v. *Bruno*, 146 Conn. App. 214, 229, 76 A.3d 725 (2013).

Our appellate courts, however, have recognized that § 52-212a "does not abrogate the court's common-law authority to open a judgment beyond the four month limitation upon a showing that the judgment was obtained by fraud, duress or mutual mistake. . . . The common-law reasons for opening a judgment seek to preserve fairness and equity." (Citation omitted; internal quotation marks omitted.) *Bruno* v. *Bruno*, supra, 146 Conn. App. 230; see also *Conroy* v. *Idlibi*, 343 Conn. 201, 205, 272 A.3d 1121 (2022) (fraud is exception to four month limitation for motion to open judgment); *Veneziano* v. *Veneziano*, 205 Conn. App. 718, 726, 259 A.3d 28 (2021) (although motion to open normally must be filed within four months of entry of judgment, motion to open based on fraud is not subject to this limitation). Our Supreme Court specifically has recognized that a marital dissolution judgment based on a stipulation between the parties may be opened if the stipulation, and thus the judgment, was obtained by fraud. See, e.g., *Reville* v. *Reville*, 312 Conn. 428, 440–41, 93 A.3d 1076 (2014); *Weinstein* v. *Weinstein*, 275 Conn. 671, 685, 882 A.2d 53 (2005); *Billington* v. *Billington*, 220 Conn. 212, 217–18, 595 A.2d 1377 (1991).

We now turn to the defendant's specific jurisdictional claim, made for the first time in this appeal.[8] He argues

---

[8] A claim that a court lacks subject matter jurisdiction may be raised at any time during the proceedings, including on appeal. See, e.g., *Mention* v. *Kensington Square Apartments*, 214 Conn. App. 720, 727, 280 A.3d 1195 (2022); *Parisi* v. *Niblett*, 199 Conn. App. 761, 768, 238 A.3d 740 (2020).

that the plaintiff's challenge to the underlying arbitration award was untimely because she did not file an application to vacate the award within thirty days of the issuance of notice of the award. As a result, the defendant contends that the trial court lacked subject matter jurisdiction to open the judgment that incorporated the arbitration award pursuant to § 52-420 (b). As factual support for this argument, he notes that McLachlan issued his award on April 27, 2017, which the court, *Sommer, J.*, then incorporated into the judgment of dissolution on June 16, 2017, and that the plaintiff did not move to open that dissolution judgment based on her claim of fraud until April 3, 2018.

"[S]ubject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . Furthermore, [j]urisdiction of the [subject matter] is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy." (Citation omitted; internal quotation marks omitted.) *A Better Way Wholesale Autos, Inc.* v. *Saint Paul*, 338 Conn. 651, 658, 258 A.3d 1244 (2021); see also *Bloomfield* v. *United Electrical, Radio & Machine Workers of America, Connecticut Independent Police Union, Local 14*, 285 Conn. 278, 286, 939 A.2d 561 (2008); *Petrucelli* v. *Travelers Property Casualty Ins. Co.*, 146 Conn. App. 631, 640, 79 A.3d 895 (2013), cert. denied, 311 Conn. 909, 83 A.3d 1164 (2014). Stated differently, "[a] court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it." *Monroe* v. *Monroe*, 177 Conn. 173, 185, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979).

Under the circumstances in the present case, the question of whether the court lacked jurisdiction over the motion to open is a question of law because it requires us to interpret the statutory provisions relied on by the parties. See, e.g., *Davis* v. *Davis*, 200 Conn. App. 180, 201, 238 A.3d 46, cert. denied, 335 Conn. 977, 241 A.3d 130 (2020); *Malpeso* v. *Malpeso*, 165 Conn. App. 151, 165, 138 A.3d 1069 (2016). Moreover, we note that there are no jurisdictional facts in dispute regarding the defendant's subject matter jurisdictional claim that would require adjudication by the trial court. See, e.g., *Sessa* v. *Reale*, 213 Conn. App. 151, 158, 278 A.3d 44 (2022); cf. *Conboy* v. *State*, 292 Conn. 642, 652–53, 974 A.2d 669 (2009) (if question of jurisdiction is intertwined with merits of case, court cannot resolve jurisdictional question without evidentiary hearing).

We turn then to the relevant statutory provisions. Section 52-420 (b) provides that "[n]o motion to vacate, modify or correct an award may be made after thirty days from the notice of the award to the party to the arbitration who makes the motion." Our Supreme Court repeatedly has held that the trial court lacks subject matter jurisdiction over a motion not filed within this thirty day time period. See, e.g., *A Better Way Wholesale Autos, Inc.* v. *Saint Paul*, supra, 338 Conn. 659; *Bloomfield* v. *United Electrical, Radio & Machine Workers of America, Connecticut Independent Police Union, Local 14*, supra, 285 Conn. 292–93. Stated differently, "[t]he only jurisdictional requirement in filing a motion to vacate an arbitration award is that it be filed with the trial court within thirty days of the moving party's notice of the arbitration award." *Middlesex Ins. Co.* v. *Castellano*, 225 Conn. 339, 345, 623 A.2d 55 (1993).

Our Supreme Court's decision in *Wu* v. *Chang*, 264 Conn. 307, 823 A.2d 1197 (2003), warrants discussion because the court in that case addressed whether an arbitration award could be attacked outside the thirty

day time period of § 52-420 (b) if the party alleges that the award was obtained through fraud. In *Wu*, the parties had formed several companies as vehicles for their investments in hotel and condominium properties, which ultimately led to financial losses. Id., 308. Disputes arose, and the defendant commenced a civil action against one of the plaintiffs, alleging improprieties in his management of the companies. Id.

After an unsuccessful attempt at mediation, the parties agreed to sell the assets of the companies and have their respective shares conclusively determined by binding, nonappealable arbitration. Id., 308–309. The arbitrator determined that the respective share of each party in the proceeds from the sale of assets would be equal to their respective capital contributions. Id., 309. Notice of the arbitration award was sent to the parties. Id.

After receiving the arbitration award, the plaintiffs filed an application to confirm the arbitration award pursuant to General Statutes § 52-417.[9] Id. The defendant objected on the basis of fraud by one of the plaintiffs, and the court treated the defendant's objection as a motion to vacate the arbitration award[10] under § 52-

---

[9] General Statutes § 52-417 provides in relevant part: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court . . . for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

[10] General Statutes § 52-418 provides in relevant part: "(a) Upon the application of any party to an arbitration, the superior court . . . shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

"(b) If an award is vacated and the time within which the award is required

420.[11] Id., 309–10. The court denied the defendant's motion to vacate, concluding that it lacked subject matter jurisdiction, as the motion had not been filed within the thirty day period set forth in § 52-420 (b). Id., 310. The defendant appealed, claiming that "the thirty day limitation period set forth in § 52-420 (b) was tolled by his claim of fraud and, consequently, the trial court improperly concluded that it lacked jurisdiction to entertain his motion to vacate." Id.

Our Supreme Court first explained that the trial court properly granted the plaintiffs' timely motion to confirm the arbitration award because the defendant's motion to vacate had not been filed within the thirty day limitation period of § 52-420 (b). Id., 312. It then turned to the defendant's contention that fraud tolled this time period. Id. In rejecting this argument, the court stated: "Chapter 909 of the General Statutes, General Statutes §§ 52-408 through 52-424, controls arbitration in this state whe[n] the common law is inconsistent with our statutory scheme. . . . The statutory arbitration scheme encompasses many aspects of the arbitration process . . . . Thus, it is evident that the legislature's purpose in enacting the statutory scheme was to displace many [common-law] rules. . . . The statutory

---

to be rendered has not expired, the court or judge may direct a rehearing by the arbitrators. . . ."

[11] General Statutes § 52-420 provides: "(a) Any application under section 52-417, 52-418 or 52-419 shall be heard in the manner provided by law for hearing written motions at a short calendar session, or otherwise as the court or judge may direct, in order to dispose of the case with the least possible delay.

"(b) No motion to vacate, modify or correct an award may be made after thirty days from the notice of the award to the party to the arbitration who makes the motion.

"(c) For the purpose of a motion to vacate, modify or correct an award, such an order staying any proceedings of the adverse party to enforce the award shall be made as may be deemed necessary. Upon the granting of an order confirming, modifying or correcting an award, a judgment or decree shall be entered in conformity therewith by the court or judge granting the order."

framework governing the arbitration process expressly covers claims of fraud. Specifically . . . § 52-418 (a) requires a court to make an order vacating [an arbitration] award if it finds . . . [that] the award has been procured by corruption, fraud or undue means . . . . Under § 52-420 (b), however, a party seeking an order to vacate an arbitration award on grounds of corruption, fraud or undue means—or on any other ground set forth in § 52-418—must do so within the thirty day limitation period set forth in § 52-420 (b). In other words, once the thirty day limitation period of § 52-420 (b) has passed, the award may not thereafter be attacked on any of the grounds specified in . . . § 52-418 . . . including fraud. To conclude otherwise would be contrary not only to the clear intent of the legislature as expressed in §§ 52-417, 52-418 and 52-420 (b), but also to a primary goal of arbitration, namely, the efficient, economical and expeditious resolution of private disputes." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 312–13.

Ultimately, our Supreme Court agreed with the reasoning of the trial court that a motion to vacate an arbitration award based on any of the grounds set forth in § 52-418, including fraud, must be filed within the thirty day period in order for the court to have subject matter jurisdiction. Id., 313–14. It is clear, therefore, that a trial court in most cases lacks subject matter jurisdiction to consider a motion to vacate an arbitration award based on a claim of fraud filed outside of the thirty day time period of § 52-420 (b).[12]

---

[12] See, e.g., *A Better Way Wholesale Autos, Inc.* v. *Saint Paul*, supra, 338 Conn. 659 (expiration of limitation period of § 52-420 (b) deprives trial court of subject matter jurisdiction over any ground to vacate arbitration award even if such ground to vacate is raised in opposition to prevailing party's application to confirm award); *Bloomfield* v. *United Electrical, Radio & Machine Workers of America, Connecticut Independent Police Union, Local 14*, supra, 285 Conn. 285–86 (thirty day limitation period of § 52-420 (b) applies to application to vacate arbitration awards on public policy grounds); *Rosenthal Law Firm, LLC* v. *Cohen*, 165 Conn. App. 467, 471, 139 A.3d 774 (thirty day limitation period to file motion to vacate arbitration award applies

Salutary policy reasons typically support the strict time requirements that limit a party's ability to attack an arbitration award. As a general rule, "[a]rbitration is favored by courts as a means of settling differences and expediting the resolution of disputes. . . . There is no question that arbitration awards are generally upheld and that we give great deference to an arbitrator's decisions since arbitration is favored as a means of settling disputes." (Internal quotation marks omitted.) *Clasby* v. *Zimmerman*, 191 Conn. App. 143, 155, 213 A.3d 1144, cert. denied, 333 Conn. 919, 217 A.3d 1 (2019); see also *Garrity* v. *McCaskey*, 223 Conn. 1, 4, 612 A.2d 742 (1992); *Jenkins* v. *Jenkins*, 186 Conn. App. 641, 645, 200 A.3d 1193 (2018). "The core principles of Connecticut's arbitration law are set forth in . . . §§ 52-408 through 52-424. . . . [Section] 52-417 provides that in ruling on an application to confirm an arbitration award [t]he court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in [General Statutes §§] 52-418 and 52-419. . . . The trial court lacks any discretion in confirming the arbitration award unless the award suffers from any of the defects described in . . . §§ 52-418 and 52-419." (Citation omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *Clasby* v. *Zimmerman*, supra, 156–57.

Additionally, our Supreme Court has explained: "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial

to grounds enumerated in § 52-418 as well as common-law ground such as claimed violation of public policy), cert. denied, 322 Conn. 904, 138 A.3d 933 (2016); *Amalgamated Transit Union Local 1588* v. *Laidlaw Transit, Inc.*, 33 Conn. App. 1, 4, 632 A.2d 713 (1993) (if motion to vacate, modify or correct is not made within thirty day limitation period of § 52-420 (b), award may not be attacked thereafter on any ground specified in § 52-418 or § 52-419).

review of the award is delineated by the scope of the parties' agreement. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . .

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved. . . .

"*Even in the case of an unrestricted submission, we have . . . recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . [and] (3) the award contravenes one or more of the statutory proscriptions of § 52-418.*" (Emphasis added; internal quotation marks omitted.) *Economos* v. *Liljedahl Bros., Inc.*, 279 Conn. 300, 305–306, 901 A.2d 1198 (2006); see also *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 273 Conn. 86, 93–94, 868 A.2d 47 (2005). The plaintiff has not raised a constitutional or public policy challenge to the arbitration award. Thus, in most contexts, the plaintiff's ability to raise her claim of fraud as to the arbitration process would be closed after the expiration of the thirty day period set forth in § 52-420 (b).

In proceedings such as the present case, however, in which an arbitration award is incorporated into a marital dissolution judgment rendered by the trial court, competing policies exist that are inherent in the statutes that apply to family matters. We start with a review

of General Statutes § 46b-66. That statute governs the approval of agreements by the parties to resolve their marital dissolution proceeding. Subsection (a) of this statute[13] requires the trial court to determine, as a preliminary matter, that a dissolution settlement agreement is fair and equitable. *Roos* v. *Roos*, 84 Conn. App. 415, 419, 853 A.2d 642 (§ 46b-66 (a) specifically grants court authority to incorporate by reference into its judgment of dissolution separation agreement reached by parties if it is determined to be fair and equitable), cert. denied, 271 Conn. 936, 861 A.2d 510 (2004); see also *Costello* v. *Costello*, 186 Conn. 773, 776, 443 A.2d 1282 (1982) (court has affirmative duty to ascertain whether parties' settlement agreement is fair, equitable, and has been knowingly agreed upon). Subsection (c) provides in relevant part that, "[i]f the court finds the agreement fair and equitable, it shall become part of the court file, and if the agreement is in writing, it shall be incorporated by reference into the order or decree of the court. If the court finds the agreement is not fair and equitable, it shall make such orders as to finances and custody as the circumstances require . . . ." General Statutes § 46b-66 (c). This type of judicial review regarding the private resolution of a dispute generally is not part of the process for other types of civil litigation. See *Brycki* v. *Brycki*, 91 Conn. App. 579, 587, 881 A.2d 1056 (2005) (requirement that court must determine whether separation agreement is fair and equitable described as "peculiar to settlement agreements in the area of family law").

---

[13] General Statutes § 46b-66 (a) provides in relevant part: "[I]n any case under this chapter where the parties have submitted to the court a final agreement concerning the custody, care, education, visitation, maintenance or support of any of their children or concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the parties and their respective fitness to have physical custody of or rights of visitation with any minor child, in order to determine whether the agreement of the parties is fair and equitable under all the circumstances."

We next turn to subsection (e) of § 46b-66,[14] which provides in relevant part: "The provisions of chapter 909 [§§ 52-408 through 52-424] shall be applicable to any agreement to arbitrate in an action for dissolution of marriage under this chapter . . . . An arbitration award in such action shall not be enforceable until it has been confirmed, modified or vacated in accordance with the provisions of chapter 909 and incorporated into an order or decree of court in an action for dissolution of marriage between the parties. . . . *An arbitration award relating to a dissolution of marriage that is incorporated into an order or decree of the court shall be enforceable and modifiable to the same extent as an agreement of the parties that is incorporated into an order or decree of the court pursuant to subsection (c) of this section.*" (Emphasis added.)

Pursuant to this statutory language, the parties may choose to use arbitration as a means to resolve some or even all of the disputed financial and custody issues relating to the dissolution of their marriage. If they choose to do so, the court must first find that the agreement to arbitrate was entered into voluntarily and is

---

[14] We are cognizant that the pertinent provisions of subsection (e) of § 46b-66 were enacted after the arbitration proceedings and the filing of the motion to open in the present case. Number 21-104, § 21, of the 2021 Public Acts amended § 46b-66, effective June 28, 2021, by, inter alia, moving subsection (c) to subsection (e), and adding the following language: "An arbitration award relating to a dissolution of marriage that is incorporated into an order or decree of the court shall be enforceable and modifiable to the same extent as an agreement of the parties that is incorporated into an order or decree of the court pursuant to subsection (c) of this section." General Statutes § 46b-66 (e).

In our view, it is appropriate to rely on this provision in resolving the present case because the statute simply clarifies, among other things, that, if the parties' final agreement to resolve their dissolution proceeding contains an arbitration award embedded in that agreement, the parties' agreement is subject to the same review and approval process set forth in subsection (c) of § 46b-66. Moreover, the legislature did not limit the applicability of this provision only to final agreements entered into after the effective date of the public act.

fair and equitable under the circumstances. If the court permits the arbitration, that arbitration is conducted in accordance with the provisions of chapter 909 of the General Statutes. Finally, subsection (e) provides that an arbitration award that is incorporated into an order or decree of the court is enforceable and modifiable to same extent as an agreement of the parties that is incorporated into an order or decree of the court pursuant to subsection (c) of § 46b-66. Therefore, arbitration awards are subject to enforcement and modification as any other aspect of the dissolution judgment. By implication, because a judgment of dissolution may be opened on the basis of fraud, an arbitration award in this context may be opened outside of the thirty day limit of § 52-420 (b) for fraud. Stated differently, unlike arbitration awards in other civil contexts, arbitration awards in dissolution matters must be made part of a dissolution judgment pursuant to § 46b-66 (e) and may be subject to modification or later attack under appropriate circumstances.

Principles of statutory construction further inform our analysis. As §§ 46b-66 and 52-420 (b) relate to the same subject matter, we presume that the legislature intended to create a harmonious and consistent body of law, and we must consider the broader statutory scheme to ensure the coherency of our construction. See *LaFrance* v. *Lodmell*, 322 Conn. 828, 837–38, 144 A.3d 373 (2016); see also *Independent Party of CT— State Central* v. *Merrill*, 330 Conn. 681, 706, 200 A.3d 1118 (2019); *Langello* v. *West Haven Board of Education*, 142 Conn. App. 248, 258, 65 A.3d 1 (2013). In doing so, we conclude that the time limitation of § 52-420 (b) does not apply in situations where an arbitration award in a dissolution proceeding has been obtained by fraud and made part of the dissolution judgment pursuant to § 46b-66 (e). A contrary result might permit such fraud to invidiously invade and infect the court's statutorily

required determination regarding the fairness and equitable nature of a final agreement of the parties. In other words, to allow an arbitration award obtained by fraud discovered outside of the very short time limitation imposed by § 52-420 (b) may severely undermine, if not eviscerate, the judicial review requirements of § 46b-66. As a result, such fraud may cause the corruption of the other aspects of a court's financial orders and fracture the mosaic of the dissolution judgment in a case in which the arbitration award is embedded in the parties' final agreement.

Further, in construing these statutes together, it is important to remember that marital dissolution proceedings are essentially equitable in nature. *Leonova* v. *Leonov*, 201 Conn. App. 285, 304, 242 A.3d 713 (2020), cert. denied, 336 Conn. 906, 244 A.3d 146 (2021). For example, in *Foisie* v. *Foisie*, 335 Conn. 525, 239 A.3d 1198 (2020), our Supreme Court described the opening of a dissolution judgment for the purpose of reconsidering financial orders on the basis of an allegation of fraud as follows: "[I]n family matters, the court exercises its equitable powers. . . . While an action for divorce or dissolution of marriage is a creature of statute, it is essentially equitable in its nature. . . . The trial court has considerable discretion to balance equities in a dissolution proceeding. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute . . . . For that reason, equitable remedies are not bound by formula but are molded to the needs of justice. . . . [I]n some situations, the principle of protection of the finality of judgments must give way to the principle of fairness and equity." (Citations omitted; internal quotation marks omitted.) Id., 543–44; see also

*Baker* v. *Baker*, 187 Conn. 315, 323, 445 A.2d 912 (1982) (trial court in dissolution of marriage action sits as court of law and of equity). Simply stated, the only remedy available to a defrauded party in a marital dissolution case is to have the court open and reconsider the judgment as a matter of equity. *Weiss* v. *Weiss*, 297 Conn. 446, 467 n.15, 998 A.2d 766 (2010).

Marital dissolution cases also have unique requirements for full and frank disclosure of relevant information between the parties and to the court. To achieve the goal of private settlements, with judicial supervision, of financial disputes between estranged marital partners, reasonable settlements that have been knowingly agreed upon are essential, and this can occur only *when the parties engage in full and frank disclosure to ensure each side has all the essential information necessary. Weinstein* v. *Weinstein*, supra, 275 Conn. 686–87. As such, in dissolution proceedings, "[t]he presiding judge has the obligation to conduct a searching inquiry to make sure that the settlement agreement is substantively fair and has been knowingly negotiated. . . . *Pivotal to the validity of such an inquiry is the absolute accuracy of the financial information furnished by the parties to one another and the court.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Jucker* v. *Jucker*, 190 Conn. 674, 676, 461 A.2d 1384 (1983); see also *Dougan* v. *Dougan*, 301 Conn. 361, 370–71, 21 A.3d 791 (2011); *Baker* v. *Baker*, supra, 187 Conn. 321–22.

Our Supreme Court has explained that the principle of complete disclosure "is consistent with the notion that the settlement of a marital dissolution case is not like the settlement of an accident case. It stamps with finality the end of a marriage. . . . Courts simply should not countenance either party to such a unique human relationship dealing with each other at [arm's] length. Whatever honesty there may, or should, have

been during the marriage should at least be required at its end." (Citation omitted; internal quotation marks omitted.) *Billington* v. *Billington*, supra, 220 Conn. 221. Further, this court has observed that, "[u]nlike civil litigants who stand at arm's length from one another, marital litigants have a duty of full and frank disclosure analogous to the relationship of fiduciary to beneficiary . . . ." (Internal quotation marks omitted.) *Mensah* v. *Mensah*, 145 Conn. App. 644, 652, 75 A.3d 92 (2013). These equitable concerns do not apply with the same vigor to arbitration proceedings that occur in commercial and other civil contexts.[15]

---

[15] We acknowledge that our Supreme Court's decision in *Blondeau* v. *Baltierra*, 337 Conn. 127, 136, 252 A.3d 317 (2020), includes language that could be read, in isolation, as inconsistent with our analysis in the present case. In *Blondeau*, a marital dissolution action, the defendant appealed from the judgment of the trial court granting the motion of the plaintiff to vacate an arbitration award and denying the defendant's corresponding motion to confirm the arbitration award. Id., 133. The arbitration award, pursuant to the submission, resolved various issues relating to the division of marital assets and child support. Id., 132–33.

On appeal, the plaintiff claimed that the Supreme Court lacked subject matter jurisdiction over an appeal taken from an order vacating an arbitration award that included issues related to child support. Id., 135. As the court explained, "[t]he plaintiff's jurisdictional argument seizes on the proviso in § 46b-66 (c) stating that the arbitration statutes, including the right to appeal under [General Statutes] § 52-423 of chapter 909, are applicable in a marital dissolution action 'provided . . . such agreement and an arbitration pursuant to such agreement shall not include issues related to child support, visitation and custody.' The plaintiff contends, in other words, that § 46b-66 (c) contains a condition precedent categorically excluding from the scope of cases subject to appeal any trial court order vacating or confirming an arbitration award that includes 'issues related to child support, visitation and custody.' " Id., 136.

In rejecting the plaintiff's argument in *Blondeau*, our Supreme Court first generally observed that "[t]he fact that the arbitration at issue involves a marital dissolution is of no consequence" and then noted that § 46b-66 (c) expressly provides that the arbitration statutes apply to arbitrations occurring in the context of a marital dissolution action. Id. The Supreme Court also noted that the final judgment in an arbitration proceeding generally is the order of the court vacating, modifying or confirming the arbitrator's award, regardless of whether the arbitration at issue involves a marital dissolution. Id. Specifically, the court explained that "[t]he restriction contained in § 46b-66 (c) [did] not operate as a categorical condition on a party's

For these reasons, we conclude that the thirty day time limitation imposed by § 52-420 (b) does not apply in the present case. A contrary conclusion would run afoul of our "strong policy that the private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine. . . . Our support of that goal will be effective only if we instill confidence in marital litigants that we require, as a concomitant of the settlement process, such full and frank disclosure from both sides, for then they will be more willing to [forgo] their combat and to settle their dispute privately, secure in the knowledge that they have all the essential information. . . . This principle will, in turn, decrease the need for extensive discovery, and will thereby help to preserve a greater measure of the often sorely tried marital assets for the support of all of the family members." (Internal quotation marks omitted.) *Reville* v. *Reville*, supra, 312 Conn. 443–44. Furthermore, to shield a fraudulently obtained arbitration award from challenge on the basis of fraud after the passage of a mere thirty days would discourage parties from engaging in these types of private settlements. For these reasons, we conclude that the court had subject matter jurisdiction to address

right of appeal but, instead, merely [limited] the enforceable scope of the parties' arbitration agreement and award under chapter 909." Id.

In our view, and for several reasons, the Supreme Court's decision in *Blondeau* does not impact our resolution of the defendant's claim that the trial court lacked subject matter jurisdiction over the plaintiff's motion to open the dissolution judgment. First, the claim in *Blondeau* involved an attack on the appellate jurisdiction of the Supreme Court rather than, as here, an attack on the subject matter jurisdiction of the trial court. Second, the language of § 46b-66 on which the plaintiff in *Blondeau* based her claim was subsequently repealed by the legislature. See footnote 14 of this opinion. Finally, and most significantly, it does not appear that the arbitration award at issue in *Blondeau* had been incorporated into a judgment of dissolution, which § 46b-66 (e) now expressly requires. Accordingly, we conclude that the procedural differences between *Blondeau* and the present case, as well as the subsequent statutory changes and fundamental dissimilarities between the claims, renders *Blondeau* inapposite.

the plaintiff's motion to open the dissolution judgment, even though it was filed outside of the time frame set forth in § 52-420 (b).

II

Having concluded that the trial court had jurisdiction over the plaintiff's motion to open, we now turn to the merits of her appeal. The plaintiff claims that the court improperly concluded that she had failed to establish probable cause as to the existence of fraud that would permit the court to open the judgment for the limited purpose of conducting discovery on that claim. See *Spilke* v. *Spilke*, supra, 116 Conn. App. 593–94; *Oneglia* v. *Oneglia*, supra, 14 Conn. App. 269–70. Specifically, she argues that, contrary to the court's determination that there was "no evidence" to support her fraud claim, she presented sufficient evidence that established probable cause to warrant further discovery and additional proceedings. We agree with the plaintiff.

The following additional facts and procedural history are relevant to our resolution of this claim. On April 3, 2018, the plaintiff moved to open the judgment on the basis of fraud.[16] The defendant filed a memorandum in opposition and exhibits on December 11, 2018. The plaintiff submitted a reply brief on January 11, 2019. Following the first appeal and our remand for additional proceedings; see *Karen* v. *Loftus*, supra, 210 Conn. App. 289; the court, *Truglia, J.*, conducted a hearing over the course of three days, September 9, 2022, and January 4 and 5, 2023, to determine whether the plaintiff met

---

[16] The plaintiff requested the following relief in her motion to open: (1) an order reopening the judgment; (2) an order awarding her 50 percent of the defendant's interest in LLBH and Partner Wealth Management, LLC, pursuant to paragraph 6 (a) of the prenuptial agreement; (3) damages; (4) interest; (5) attorney's fees; (6) costs; (7) in the alternative, a new marital dissolution trial; and (8) such other and further relief as the court deemed just and equitable.

her burden to move forward with discovery in connection with her motion to open. At the hearing, the plaintiff, the defendant, and Kevin Collins, the plaintiff's attorney during the arbitration, testified. Additionally, because McLachlan was unavailable to testify, a transcript of his December 19, 2022 deposition was admitted into evidence.

On January 5, 2023, at the conclusion of the hearing, Judge Truglia stated that the plaintiff had failed to prove that the defendant had misled McLachlan at the arbitration and therefore denied the motion to open. Approximately one month later, the court issued a "statement of decision" that provided in relevant part: "The gravamen of the plaintiff's motion to open is that the defendant made material statements during the arbitration . . . that were false, and that the defendant knew were false. The plaintiff alleges in her motion that [McLachlan] relied on these false statements in reaching a decision that was unfavorable to her. Had the defendant not made false statements during the arbitration proceedings, the plaintiff further alleges, the outcome of the arbitration would have been different. . . .

"The court heard approximately nine hours of testimony from both parties in this case and two other witnesses over the three days of evidentiary hearing. The court carefully reviewed and weighed the testimony presented. The court also carefully reviewed all of the exhibits submitted by the plaintiff in support of her motion. *The court found no evidence of fraud.*" (Citation omitted; emphasis added.)

As an initial matter, we review the relevant legal principles. "In *Oneglia* v. *Oneglia*, [supra, 14 Conn. App. 267], this court held that, in considering a motion to open on the basis of fraud, a court must first make a preliminary determination of whether there is probable cause to believe that the judgment was obtained by

fraud. *Oneglia* and its progeny are grounded in the principle of the finality of judgments. . . . [T]he finality of judgments principle recognizes the interest of the public as well as that of the parties [that] there be fixed a time after the expiration of which the controversy is to be regarded as settled and the parties freed of obligations to act further by virtue of having been summoned into or having appeared in the case. . . . Without such a rule, no judgment could be relied on. . . . *Oneglia* carefully balanced that interest in finality with the reality that in some situations, the principle of protection of the finality of judgments must give way to the principle of fairness and equity. . . . The court in *Oneglia* thus ratified the gatekeeping mechanism employed by the trial court, whereby a court presented with a motion to open by a party alleging fraud in a postjudgment dissolution proceeding conducts a preliminary hearing to determine whether the allegations are substantiated. . . . [I]f the plaintiff was able to substantiate her allegations of fraud beyond mere suspicion, then the court [properly] would open the judgment for the limited purpose of discovery, and would later issue an ultimate decision on the motion to open after discovery had been completed and another hearing held. . . . *This preliminary hearing is not intended to be a full scale trial on the merits of the [moving party's] claim. The [moving party] does not have to establish that he [or she] will prevail, only that there is probable cause to sustain the validity of the claim.*" (Emphasis added; internal quotation marks omitted.) *Kuselias* v. *Zingaro & Cretella, LLC*, 224 Conn. App. 192, 195–96 n.2, 312 A.3d 118, cert. denied, 349 Conn. 916, 316 A.3d 357 (2024).

Stated differently, "a party seeking to obtain discovery related to allegedly fraudulent conduct that transpired prior to the entry of judgment must, consistent with the aforementioned precedent, (1) move to open

that judgment and (2) demonstrate to the trial court that the allegations of fraud are founded on probable cause. Absent such evidence, the court lacks authority to permit postjudgment discovery on such matters." *Brody* v. *Brody*, 153 Conn. App. 625, 634, 103 A.3d 981, cert. denied, 315 Conn. 910, 105 A.3d 901 (2014); see also *Nolan* v. *Nolan*, 76 Conn. App. 583, 585, 821 A.2d 772 (2003). This is because, until the judgment has been opened, there is no active civil matter, discovery is permitted only when there is a cause of action pending, and "there is no such thing as postjudgment discovery in a vacuum." (Internal quotation marks omitted.) *Bruno* v. *Bruno*, supra, 146 Conn. App. 231.

Next, we identify the applicable standard of review. Generally, our decisions have applied a discretionary standard of review to the denial of a motion to open. "Our review of a court's denial of a motion to open [based on fraud] is well settled. . . . In an appeal from a denial of a motion to open a judgment, our review is limited to the issue of whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Cimino* v. *Cimino*, 174 Conn. App. 1, 5, 164 A.3d 787, cert. denied, 327 Conn. 929, 171 A.3d 455 (2017).

In this appeal, however, the specific legal issue raised by the plaintiff warrants the application of a less deferential standard of review. Here, the plaintiff claims that the trial court improperly determined that she had failed to establish probable cause to substantiate her fraud allegations. Our Supreme Court has stated that "[w]hether particular facts constitute probable cause is a question of law." (Internal quotation marks omitted.)

*Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 682, 804 A.2d 823 (2002); *Paranto* v. *Ball*, 132 Conn. 568, 571, 46 A.2d 6 (1946). Accordingly, we apply the plenary standard of review to the plaintiff's claim. See *Rousseau* v. *Weinstein*, 204 Conn. App. 833, 853, 254 A.3d 984 (2021); see also *State* v. *Smith*, 344 Conn. 229, 244, 278 A.3d 481 (2022); *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007); *Nowak* v. *Environmental Energy Services, Inc.*, 218 Conn. App. 516, 530, 292 A.3d 4 (2023).

With our standard of review in mind, we turn to the relevant legal principles regarding the standard of probable cause. We acknowledge that most of the cases that have addressed the existence of probable cause in the context of a motion to open based on fraud have not discussed the standard itself in much detail. Accordingly, we look to the use of probable cause in other contexts for guidance. "Our Supreme Court has determined that [p]robable cause is a standard widely used to validate a preliminary impairment of a broad range of personal and property rights, from the suspension of professional licenses to the issuances of warrants for seizure and arrest. . . . A hearing in probable cause is not intended to be a full scale trial on the merits of the [moving party's] claim. The [moving party] does not have to establish that he [or she] will prevail, only that there is probable cause to sustain the validity of the claim. . . . The court's role in such a hearing is to determine probable success by weighing probabilities. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true

than false." (Citations omitted; internal quotation marks omitted.) *Malave* v. *Ortiz*, 114 Conn. App. 414, 426, 970 A.2d 743 (2009);[17] see also *Spilke* v. *Spilke*, supra, 116 Conn. App. 594 n.6; *Goree* v. *Goree*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA-17-5018347-S (May 26, 2022).

[17] The Superior Court in *Malave* v. *Ortiz*, Superior Court, judicial district of New Haven, Docket No. FA-05-4008026-S (March 19, 2007) (43 Conn. L. Rptr. 148), aff'd, 114 Conn. App. 414, 970 A.2d 743 (2009), set forth a thorough discussion of the probable cause standard as applied in various family, administrative, civil and criminal contexts. "Running throughout all the cases describing the probable cause standard are certain constants. The standard is described, on the one hand, as a modest one; *36 DeForest Avenue, LLC* v. *Creadore*, 99 Conn. App. 690, [698], 915 A.2d 916 (2007); more than mere belief, suspicion or conjecture; *Heussner* v. *Day, Berry & Howard, LLP*, 94 Conn. App. 569, [577, 893 A.2d 486, cert. denied, 278 Conn. 912, 899 A.2d 38] (2006); no matter how sincere; but substantially less than proof beyond [a] reasonable doubt necessary for conviction; *State* v. *Clark*, 255 Conn. 268, 291–94, 764 A.2d 1251 (2001); and not as demanding as proof by a fair preponderance of the evidence. *Newtown Associates* v. *Northeast Structures, Inc.*, 15 Conn. App. 633, 636–37, 546 A.2d 310 (1988). The United States Supreme Court has described probable cause as a fluid concept— turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully, reduced to a neat set of legal rules. *Illinois* v. *Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). [The Appellate] Court has repeatedly emphasized, in a variety of contexts, that probable cause is a flexible [commonsense] standard. *36 DeForest Avenue, LLC* v. *Creadore*, supra . . . 695 (application to discharge [mechanic's] lien); *Morris* v. *Cee Dee, LLC*, 90 Conn. App. 403, 411 [877 A.2d 899] (prejudgment remedy) [cert. granted, 275 Conn. 929, 883 A.2d 1245 (2005) (appeal withdrawn March 13, 2006)]; *Donenfeld* v. *Friedman*, 79 Conn. App. 64, [68, 829 A.2d 107] (2003) (application for discharge of lis pendens); *Ezikovich* v. *Commission on Human Rights & Opportunities*, [57 Conn. App. 767, 771, 750 A.2d 494] (finding of reasonable cause regarding discrimination or retaliation necessary before [c]ommission may undertake certain actions) [cert. denied, 253 Conn. 925, 754 A.2d 796 (2000)]. The most frequent articulation of the probable cause standard in Connecticut cases is that [t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . .

"The court's role in such a hearing is to determine probable successes by weighing probabilities. . . . In judging the probabilities, a court must weigh the evidence, assess the credibility and demeanor of the witnesses, and evaluate exhibits offered. Evidence offered by the party subject to that

We next turn to the evidence offered by the plaintiff in support of this standard. We first recognize that the fraud inquiry was made more difficult because no transcript exists from the arbitration proceeding, as it was not held on the record. We must, therefore, rely on other documents, including the defendant's April 3, 2017 arbitration brief, the arbitration decision itself, the testimony from the motion to open hearing, and McLachlan's December 19, 2022 deposition, to determine whether the plaintiff has met her burden to establish probable cause as to the existence of fraud.

The issue at the February 16 and 17, 2017 arbitration concerned the interpretation of paragraph 6 (B) of the prenuptial agreement and whether the defendant had "*left his employment with Merrill Lynch under an arrangement that is in any fashion tantamount to a 'sale' of his interest in Merrill Lynch, i.e. a transaction under which* [*the defendant*] *receives any property*, real or personal, *including but not limited to a sum of money*, by way of a 'sign-on' bonus or otherwise, a premium bonus, and/or restricted stock or other ownership interest ('Sale Proceeds'), *to work for another entity for any reason whatsoever*, including his bringing a book of business and/or a clientele and/or a book of other assets to a prospective employer, [and, if so] then [the defendant] shall first be entitled to set aside the value of $75,000, or $75,000 from the Sale Proceeds, and the balance of such Sale Proceeds, whenever received or receivable by [the defendant], shall be divided between [the defendant and the plaintiff]." (Emphasis added.)

In the defendant's arbitration brief, he claimed that neither his prior employment at Merrill Lynch nor his

standard is not to be accepted uncritically or presumed to be true; nor is the evidence necessarily construed, as would be true on a motion to dismiss at the end of a plaintiff's [case-in-chief] in a full-blown trial, in the light most favorable to the plaintiff." (Citation omitted; internal quotation marks omitted.) *Malave* v. *Ortiz*, supra, 43 Conn. L. Rptr. 148–49.

"book of business" had anything to do with the formation of LLBH. Additionally, he maintained that his business at LLBH bore "no resemblance to his prior business at Merrill Lynch," and he "did not bring [former Merrill Lynch] clients to LLBH and LLBH did not bring those clients." He also stated that Focus purchased an option to buy a minority interest in LLBH for $2 million "*soon after its formation . . . .*" (Emphasis added.) He described LLBH as a "startup company" and that he was self-employed in a new industry at Focus. The defendant further indicated that Focus purchased this option after LLBH had been formed and was open for business, and, because the defendant and his three partners had already left Merrill Lynch, the option bought by Focus was not material to his departure from that company. Finally, the defendant maintained that Focus' option to purchase *"was a transaction which has no nexus to the defendant's leaving the employ of Merrill Lynch, was not 'tantamount to a sale' of his interest in Merrill Lynch, and as such does not implicate the provisions of* [*the parties' prenuptial agreement*].*"* (Emphasis added.)

In his arbitration award, McLachlan found that, when the defendant and his partners left Merrill Lynch and formed LLBH, each invested approximately $10,000 to $15,000 into the startup of this business. He further determined that Focus purchased the option to buy an interest in LLBH for $2 million shortly after its formation, and each partner received $500,000. After Focus exercised this option to purchase an interest in LLBH, a corporate reorganization, and the creation of a new entity known as Partner Wealth Management, LLC, the defendant received, inter alia, $1,655,000 and 90,000 shares of Focus stock.

McLachlan then determined that the language of paragraph 6 (B) of the parties' prenuptial agreement did not apply to the defendant's departure from Merrill Lynch

and the formation of a new business with his partners. "The only conclusion one could reach is . . . that [paragraph 6 (B)] was drafted in contemplation of [the defendant] leaving Merrill Lynch and *going to a competitor who would pay him to come not only in recognition of the Merrill Lynch employment benefits he would be forfeiting, but because some of the contacts and business that he would be bringing with him . . . .* The context, as it actually occurred, was [the defendant] leaving initially with three (3) partners to form a new business. *He and his partners were not paid to go to LLBH* but, in fact, each paid into the venture to start it. . . . This is substantially different than the situation where an employee leaves a brokerage house and is compensated by the new employer. [The defendant's] new employer was a company that he owned a portion of and in which he had invested. *The new employer was not in a position to, and in fact, did not give him any property, real or personal, including, but not limited to, a sum of money by way of a 'sign-on' bonus* or otherwise, a premium bonus and/or restricted stock or other ownership interest. [The defendant] acquired an ownership interest in LLBH because he invested in it. This transaction is not tantamount to a sale. *He was then able to sell a portion of that ownership interest to Focus.*" (Emphasis added.) The arbitration decision, therefore, accepted the defendant's testimony about the timeline of events regarding his departure from Merrill Lynch and forming LLBH.

At the hearing on the plaintiff's motion to open, however, the defendant acknowledged that Focus paid him and his three partners $2 million at the same time LLBH was formed. The defendant admitted that the option agreement with Focus was signed on the same day that he resigned from Merrill Lynch. He also conceded that the negotiations with Focus had occurred prior to his leaving Merrill Lynch and that Focus was committed to

supporting their new business venture. The defendant further admitted that he received $500,000 from Focus at the time he left Merrill Lynch. The defendant then conceded that, during a prior deposition, he had stated that "no one gave [him] any money" when he formed LLBH with his partners. Several aspects of the defendant's testimony were contrary to his prior statements and the evidence presented to McLachlan during the arbitration hearing.

Additionally, during a July 27, 2016 deposition that was taken as a part of the marital dissolution proceeding and utilized at the hearing before Judge Truglia, the defendant had testified that he and his three partners left Merrill Lynch and "put our own money into LLBH. . . . We set up our firm. We put our own capital in, and we set up a business." Later in that deposition, the defendant stated: "For the record, for the record, *I did not sell anything. . . . I started a business. No one— no one gave me any money. I got no consideration. I put my own money into a . . . new company,* took [an] inordinate amount of risk at the absolute peak of the financial crisis, had no way of knowing that my clients would come with me, [and] walked away from . . . millions of dollars . . . ." (Emphasis added.)

The defendant's counsel indicated to Judge Truglia that, during the arbitration proceeding, McLachlan had been provided with a copy of the option agreement between LLBH and Focus.[18] The plaintiff's attorney disagreed with this representation. The defendant confirmed that the option contract was executed on October 17, 2008, the same day he and his three partners left their employment with Merrill Lynch. The defendant further conceded that the negotiation regarding the

---

[18] The court subsequently stated that it considered it "very important" and a "[v]ery significant piece of evidence as to whether . . . McLachlan . . . had [the option contract] in front of him when he issued his decision."

option contact had occurred prior to October 17, 2008, and he knew he would receive payment once the contract was executed. The defendant then admitted, during a September 26, 2016 deposition during the dissolution proceedings, that he had stated that he started LLBH "on day one with nothing" and set up a new company that did not pay him "anything."

At the January 4, 2023 hearing, the plaintiff's counsel read from the defendant's testimony in a separate lawsuit[19] in which he had testified that the option contract with Focus had been contemplated before leaving Merrill Lynch, and he described his receipt of $500,000 as a "payment." In this prior testimony, he also stated that he and his LLBH partners, over the course of three months, brought over approximately $375 million in assets to manage from former Merrill Lynch clients.

The plaintiff testified at the hearing on her motion to open that she, her attorney and McLachlan had not been in possession of the Focus option agreement at the time of the arbitration, and that she did not learn of its existence, or the subsequent asset purchase agreement, until "[l]ong after" the arbitration.[20] She also stated that, at the arbitration hearing, the defendant had testified that it was not until "sometime after" he left Merrill Lynch and formed LLBH "that Focus came around in any way." She also recalled that his testimony before McLachlan was that he and his partners had no contact with Focus before leaving Merrill Lynch. She further indicated that, at the time of his departure from Merrill Lynch, the defendant had worked to transfer client accounts to the new enterprise.

---

[19] See *Lomas* v. *Partner Wealth Management, LLC*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-15-5014808-S.

[20] On cross-examination, the plaintiff conceded that she was aware that the defendant had received a payment from Focus on or about October 17, 2008. She also acknowledged that she was generally aware of a financial agreement with Focus in May, 2007.

Pursuant to an agreement of the parties, the court admitted into evidence a transcript of McLachlan's December 19, 2022 deposition. During his deposition, McLachlan was shown a copy of the October 17, 2008 Focus option agreement, and he testified that he did not recognize it and that he knew that it was not part of the record during the arbitration proceeding. He specifically stated that he was unaware "when [he] issued [his] award that [the defendant] and his partners had executed an option agreement with Focus . . . on the very day they left Merrill Lynch to open their own business." On the basis of the evidence presented during the deposition, which differed from what had been presented during the arbitration proceeding, McLachlan concluded that this transaction had occurred on the same day that the defendant left Merrill Lynch, contrary to his statement in the award that Focus purchased an option to buy an interest in LLBH shortly after LLBH's formation. McLachlan also testified that he had been unaware that the defendant received $500,000 from Focus on the day he left Merrill Lynch. He specifically stated that "the timeline [described by the defendant at the arbitration proceeding] was a little bit different and not as crisp as the timeline [described by the defendant at the hearing on the plaintiff's motion to open]." McLachlan also testified that there was no evidence at the arbitration hearing that the defendant and his partners had been negotiating with Focus prior to their departure from Merrill Lynch. McLachlan also had not known that approximately $350 million to $370 million dollars of business from Merrill Lynch clients had been transferred to LLBH.

During cross-examination by the defendant's counsel during his deposition, McLachlan described his recollection of the defendant's theory of the case: "Well, he said first of all he wasn't being paid—this is as I recall

his theory—he wasn't being paid for bringing the clients, the book of business with him, he was—because what he was doing was different, that he—I am not sure if he represented—if he was advising corporations when he was at Merrill Lynch that went to advising individuals, but that it wasn't really the same as just bringing a book of business because he started a new business. And his theory was that he started this new business, he and his partners, that it wasn't as though they went to [an existing competitor of Merrill Lynch]." McLachlan later was asked: "[I]n your mind, [were] there any efforts made to obfuscate the existence of the option, the $2 million payment, $500,000 of which went to [the defendant] or it's temporal connection with the group of men leaving Merrill Lynch?" He responded: "Well, I would say yes. I think there was, I—I mean, I think, you know, [the defendant] didn't want to represent that [he] walked out the door and somebody gave [him] $500,000. You know, whether or not that would still be within [paragraph 6 (B) of the prenuptial agreement] is a separate issue, but he certainly didn't say that [he] had a deal with Focus, that when [the four partners] left they were going to [be paid] $2 million." McLachlan also stated that, had he known this information regarding the timing of the Focus option agreement, he would have asked more questions and that the facts ultimately were different from the impression that he had formed at the arbitration proceeding, and based on these facts, it looked "more like they were going to work for Focus than starting their own business."

We now turn to the legal principles governing fraud in the context of a motion to open filed in a marital dissolution action. We emphasize that, at this stage of the proceedings, the plaintiff is not required to prove the existence of fraud but, rather, must demonstrate only probable cause as to the existence of fraud in

order for the court to open the judgment for the limited purpose of proceeding with discovery. See, e.g., *Long-bottom* v. *Longbottom,* 197 Conn. App. 64, 72, 231 A.3d 310 (2020). Additionally, "[t]his preliminary hearing is not intended to be a full scale trial on the merits of the [moving party's] claim. *The* [*moving party*] *does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim.* . . . If the moving party demonstrates to the court that there is probable cause to believe that the judgment was obtained by fraud, the court may permit discovery." (Emphasis added; internal quotation marks omitted.) Id.[21]

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . .

"Fraud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak. . . . A lack of full and fair disclosure

---

[21] At the conclusion of the hearing, the court explained that the plaintiff had failed to present any "compelling evidence" or prove that the defendant had "misled" McLachlan at the arbitration. In its subsequent "statement of decision," the court indicated that it "found no evidence of fraud." These statements suggest that the court misapprehended the plaintiff's burden. As to the former, there is no requirement in our law that the plaintiff present "compelling" evidence of fraud in the context of a motion to open the judgment. Regarding the latter, the plaintiff was required only to meet the lesser standard of probable cause, and, as we conclude in this opinion, she has done so.

of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment. . . . *In a marital dissolution case, the requirement of a duty to speak is imposed* by Practice Book § [25-30], requiring the exchange and filing of financial affidavits . . . and *by the nature of the marital relationship.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 72–73; see also *Reville* v. *Reville*, supra, 312 Conn. 441–42; *Cimino* v. *Cimino*, supra, 174 Conn. App. 9–11; *Pospisil* v. *Pospisil*, 59 Conn. App. 446, 450, 757 A.2d 655, cert. denied, 254 Conn. 940, 761 A.2d 762 (2000).

The plaintiff presented evidence that, during the arbitration proceeding, the defendant represented to McLachlan that he and his partners left their employment at Merrill Lynch essentially to start a new company, LLBH, and that they did not receive any funding from Focus until after its formation. The defendant specifically had argued to McLachlan that the Focus payment of $2 million constituted a transaction without a nexus to his departure from Merrill Lynch. Indeed, during a deposition taken earlier in this proceeding, he stated that he did not sell anything, nor did he receive any money or consideration from a third party; he used his own money to create a new business. He also failed to provide the plaintiff or McLachlan with a copy of the Focus option agreement. The plaintiff presented further evidence that showed that the defendant and his partners had been working with Focus prior to their departure from Merrill Lynch, and they executed the option agreement with Focus on the same day they formed LLBH. The group also brought over former Merrill Lynch clients and their assets worth approximately $375 million.

Applying the flexible, commonsense standard of probable cause that would warrant a person of ordinary

caution, prudence and judgment to entertain a bona fide belief in the existence of the claim of fraud, we conclude that the plaintiff had satisfied her "modest" burden at this preliminary stage of the proceedings by substantiating her allegations to warrant discovery and further proceedings. Our Supreme Court has instructed that, in determining whether there is proof of fraud, a court should consider the evidence "through the lens of our well settled policy regarding full and frank disclosure in marital dissolution actions." (Internal quotation marks omitted.) *Reville* v. *Reville*, supra, 312 Conn. 442. Pursuant to paragraph 6 (B) of the parties' prenuptial agreement, if the defendant ended his employment with Merrill Lynch under an arrangement that was tantamount to a sale of his interest therein, then the plaintiff was entitled to a share of the proceeds. If, however, the defendant left Merrill Lynch under conditions that were not tantamount to a sale, then the plaintiff would not receive any additional money from the defendant. The defendant, therefore, had a financial incentive to misrepresent the nature and timing of his dealings with Focus in connection with the formation of LLBH. Stated differently, by framing this transaction as the risky creation of a new business done solely with modest financial contributions from himself and the other LLBH partners, rather than one in which he received a substantial sum of money along with the backing and assistance from a third party, a reasonable person could conclude that the defendant used deception regarding the circumstances surrounding his leaving Merrill Lynch and the formation of LLBH in order to deprive the plaintiff of her share of the money from the new venture to which she was entitled pursuant to paragraph 6 (B) of the prenuptial agreement. See *Grayson* v. *Grayson*, 4 Conn. App. 275, 287, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987); see also *Reville* v. *Reville*, supra, 441; *Gelinas* v. *Gelinas*, 10

Conn. App. 167, 173, 522 A.2d 295, cert. denied, 204 Conn. 802, 525 A.2d 965 (1987).

We determine that the plaintiff presented evidence that satisfied the probable cause standard that the defendant had made false statements, or failed to disclose facts, regarding the details of the end of his employment at Merrill Lynch and the formation of LLBH in an effort to deprive her of money she may have been entitled to under the terms of the parties' prenuptial agreement. Such conduct, if proven, would result in a situation "in which one party held a valuable asset, the true worth and nature of which only that party knew." *Weinstein* v. *Weinstein*, supra, 275 Conn. 690. Efforts to hide or obfuscate material facts in a marital dissolution proceeding are incompatible with our jurisprudence, and we will not countenance such an attempt to unfairly bypass the conditions of a prenuptial agreement to the detriment of the plaintiff. See id., 695; see also *Miller* v. *Appleby*, 183 Conn. 51, 57 n.1, 438 A.2d 811 (1981) (when false representations are made for purpose of inducing act to another's injury, necessarily there is plain implication that such representations were made with intent to deceive). We conclude, therefore, that the court improperly denied the plaintiff's motion to open the judgment based on fraud. As a result, we reverse the trial court's judgment denying the plaintiff's motion to open and remand the case with direction to open the judgment for the limited purpose of allowing further discovery in conjunction with the plaintiff's claim of fraud.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.